[No. 82194-1.   En Banc.]

Argued October 13, 2009.       Decided February 4, 2010.

*In the Matter of the Personal Restraint of* JAMES W. GRANTHAM, *Petitioner.*

*David L. Donnan* and *Nancy P. Collins* (of *Washington Appellate Project*), for petitioner.

*Robert M. McKenna, Attorney General, Jay D. Geck, Deputy Solicitor General,* and *Peter W. Berney, Assistant,* for respondent.

¶1 CHAMBERS, J. — James Grantham, an inmate, was disciplined for attempting to smuggle tobacco and marijuana into the McNeil Island Corrections Center. He challenges the disciplinary process and the sufficiency of the evidence against him. We take this opportunity to clarify the approach courts must take in such cases and hold that a petitioner seeking relief in a personal restraint petition from prison discipline is not required to make a prima facie showing of prejudice, since no opportunity for judicial review is otherwise available. However, the burden is on the petitioner to show that the disciplinary action was so arbitrary and capricious as to deny a fundamentally fair proceeding. Grantham was not denied a fundamentally fair

proceeding. We affirm the Court of Appeals on different grounds and dismiss the petition.

## FACTS

¶2 Grantham was convicted of first degree murder in 1995 and sentenced to 416 months to be served consecutively to his pending sentence for two counts of second degree rape. In 2007, an investigation at McNeil Island Corrections Center revealed that a corrections officer was bringing contraband into the prison. Once confronted, the corrections officer turned over a plastic bag that contained smoking and chewing tobacco together with a coffee can containing marijuana. The corrections officer did not know the name of the person who gave her the contraband but had his phone number. The number belonged to Grantham's brother. After a brief investigation, the Department of Corrections filed a discipline notice against Grantham, alleging "[p]ossession, introduction, use or transfer" of tobacco and controlled substances, violations of WAC 137-25--030(603) and (606) respectively. Personal Restraint Pet., App. C. According to the infraction report:

> During the course of a HQ Special Investigation Unit (SIU) investigation of staff misconduct at [the McNeil Island Corrections Center (MICC)], information was received and evidence recovered that the staff member under investigation was introducing contraband into MICC. This staff member turned over one plastic bag of contraband to the SIU unit that contained two (2) large Top tobacco tins, five (5) cans of Grizzly chew tobacco, one (1) large bag of Gambler tobacco and one (1) jar of Folgers coffee. Inside the [F]olgers' jar was a package wrapped in plastic and duct tape that contained a green leafy substance that later tested positive for marijuana. The staff member who surrendered the package did not know the name of the person dropping off the package in Tacoma, but did have the phone number which was 253-905-0525. This number verified by phone records belongs to the brother of offender James Grantham DOC [Department of Corrections] #703436. This type of drop off to this staff member had occurred on more

than one occasion since June 2007. I, knowing offender Grantham's voice overheard offender Grantham tell his brother to buy the coffee and make sure he had it ready for Sunday, then asked his brother if he had gotten the other stuff. Offender Grantham and his brother talked about meeting people to complete deals in Tacoma. Offender Grantham's brother has been alerted on at least one time at MICC by the narcotic K-9.

Personal Restraint Pet., App. D.

¶3 The offending corrections officer is never named in the record before us. The conversation overheard by the investigating officer was a phone conversation between Grantham and his brother that never explicitly mentions tobacco or marijuana. It had been recorded by the department. Grantham filed two public disclosure act requests, asking for a copy of the phone conversation the investigating officer referred to and for the officer's investigative reports. It is not clear from the record how the department responded to the request for a copy of the phone conversation, but the department's statement that there were no such investigative reports is attached to the petition. It appears the recording of the phone conversation was not played at the hearing.

¶4 Grantham attended the hearing. Based on the investigative report, the hearing officer found Grantham guilty of both counts. He was sanctioned with 25 days' disciplinary segregation and a loss of both 90 days' good time credit and 7 days of yard privileges. Grantham filed an unsuccessful internal appeal with the superintendent, claiming lack of due process. He then filed this personal restraint petition, claiming that he did not receive due process and that the hearing officer lacked sufficient evidence to find guilt. Grantham stressed that the investigator acknowledged that he and his brother never explicitly discussed marijuana or tobacco. He also argued that the notice was defective because it failed to specify the time and place of his conversation with his brother. He asks that the findings of guilt be expunged, that his good time and long term

minimum custody status be restored, that he be returned to a minimum security facility, and that his visiting privileges be restored. The acting chief judge of the Court of Appeals dismissed the petition, mostly based on standards not challenged here. However, he rejected Grantham's argument that he was entitled to know the time and place of the recorded conversation with his brother without reaching the merits, saying, "[E]ven if the infraction report did not fully satisfy the requirements of WAC 137-28-270, Grantham does not show that he was actually or substantially prejudiced by that deficiency." Order Dismissing Pet. at 3-4.

¶5 In his initial ruling, Washington State Supreme Court Commissioner Steven M. Goff noted that the Court of Appeals relied on the actual and substantial prejudice standard and that the standard "does not apply where the petitioner has had no previous opportunity for judicial review," and directed the department to file supplemental briefing "in light of the proper standard of review." Ruling at 2-3. The department filed a vigorous brief arguing its disagreement with the commissioner on the proper standard and contending that, notwithstanding our opinion in *In re Personal Restraint of Isadore*, 151 Wn.2d 294, 299, 88 P.3d 390 (2004), prisoners facing discipline are still required to meet the *Lord*[1] prima facie standard when challenging disciplinary decisions. We accepted review. *In re Pers. Restraint of Grantham*, noted at 166 Wn.2d 1006, 211 P.3d 1029 (2009).

## ANALYSIS

### *Isadore*, Habeas, and Prison Discipline

¶6 We granted review primarily to resolve the apparent dispute as to whether the *Lord* standard applies to personal restraint petitions where there has been no previous opportunity for judicial review. Personal restraint petitions have

---

[1] *In re Pers. Restraint of Lord*, 152 Wn.2d 182, 94 P.3d 952 (2004).

evolved from writs of habeas corpus. In order to determine the appropriate threshold prima facie burden to apply, we find it useful to examine the development of personal restraint petitions within that historical context. *In re Pers. Restraint of Hagler*, 97 Wn.2d 818, 823-24, 650 P.2d 1103 (1982) (describing the history of the personal restraint petition). The United States Supreme Court once said that historically, habeas was limited to determining if the court restraining a person had the jurisdiction to do so. As Justice Marshall put it, "[a]n imprisonment under a judgment cannot be unlawful, unless that judgment be an absolute nullity; and it is not a nullity, if the court has general jurisdiction of the subject, although it should be erroneous." *Ex parte Watkins*, 28 U.S. (3 Pet.) 193, 203, 7 L. Ed. 650 (1830). Scholars have cast significant doubt on that limitation on the scope of habeas. *See, e.g.*, BADSHAH K. MIAN, AMERICAN HABEAS CORPUS: LAW, HISTORY, AND POLITICS 190-91 (1984).[2] More than a century later, the Supreme Court rejected *Watkins*, noting that at common law, "restraints contrary to fundamental law, by whatever authority imposed, could be redressed by writ of habeas corpus." *Fay v. Noia*, 372 U.S. 391, 408, 83 S. Ct. 822, 9 L. Ed. 2d 837 (1963), *overruled in part on other grounds by Wainwright v. Sykes*, 433 U.S. 72, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977). However, the *Watkins* dictum does emerge from time to time as the basis for limiting the writ. While taking a more expansive view, Justice William Brennan echoed Black-stone's description of habeas as " 'the most celebrated writ in the English law.' " *Id.* at 400 (quoting 3 WILLIAM

---

[2] As Mian wrote:

> The contention of Chief Judge Marshall that a court constituted under a statute must look to the statute for habeas jurisdiction has, with the passage of time, become dogma and its truth appears to have grown self-evident. The fact is that this dogma has never been seriously challenged. A careful appraisal of the issue will indicate that the contention is erroneous, both logically and historically. It stood undisturbed just because of the antiquity, and the superior status of the court and the justice who delivered the judgment. The contention is wrong as there is no evidence in its support either in the legal history of England or that of the United States.

MIAN, *supra*, at 190-91.

BLACKSTONE, COMMENTARIES 129). Borrowing from English authorities, he described it as

> "a writ antecedent to statute, and throwing its root deep into the genius of our common law. . . . It is perhaps the most important writ known to the constitutional law of England, affording as it does a swift and imperative remedy in all cases of illegal restraint or confinement. It is of immemorial antiquity, an instance of its use occurring in the thirty-third year of Edward I."[3]

*Id.* (alteration in original) (quoting *Sec'y of State for Home Affairs v. O'Brien*, [1923] A.C. 603, 609 (H.L.)). Simply put, habeas has played a critical role in the development of equal justice under law. Justice Brennan said that in the history of habeas

> may be discerned the unceasing contest between personal liberty and government oppression. It is no accident that habeas has time and again played a central role in national crises, wherein the claims of order and of liberty clash most acutely, not only in England in the seventeenth century, but also in America from our very beginnings, and today.

*Id.* at 400-01 (footnote omitted) (citing 1 WILLIAM SEARLE HOLDSWORTH, A HISTORY OF ENGLISH LAW 227-28 (1927); Zechariah Chafee, *The Most Important Human Right in the Constitution*, 32 B.U. L. REV. 143, 146-59 (1952); WILLIAM S. CHURCH, A TREATISE OF THE WRIT OF HABEAS CORPUS § 40 (1884)).

¶7 Habeas is so fundamental to our history and legal traditions that American colonial courts in the 17th century asserted the power of habeas without any relevant authorizing legislation and arguably in violation of English law. A.H. Carpenter, *Habeas Corpus in the Colonies*, 8 AM. HIST. REV. 18, 20-21 (1902), *available at* http://www.jstor.org/stable/1832572. Like habeas, the personal restraint petition can be a great guardian of liberty. Like habeas, it is not

---

[3] According to the Official Website of the British Monarchy, Edward I ruled England from 1272 to 1307. *See* http://www.royal.gov.uk/HistoryoftheMonarchy/KingsandQueensofEngland/ThePlantagenets/EdwardILongshanks.aspx (last visited Feb. 1, 2010).

a substitute for an appeal. *Hagler*, 97 Wn.2d at 824 (citing *In re Pers. Restraint of Myers*, 91 Wn.2d 120, 121 n.1, 587 P.2d 532 (1978)). To prevent it from becoming a substitute for an appeal, and to protect the finality of judgments, this court has imposed significant threshold, prima facie burdens on the petitioner before the merits of the substantive claim will be considered. However, not all decisions that impose restraints that can be examined in a habeas or personal restraint petition are also appealable. *See generally* RAP 16.4(c)(6) (personal restraint petition available to challenge "conditions or manner of the restraint of petitioner [that] are in violation of the Constitution of the United States or the Constitution or laws of the State of Washington").

¶8 Courts are reluctant to shut the courthouse doors to potentially meritorious challenges to convictions and reluctant to revisit settled judgments. The process of harmonizing the tension between these principles is, of course, ongoing. Justice Pearson noted that an attempt to establish a consistent standard had to be abandoned because it "proved to be too blunt an instrument for the delicate operation of determining claims which should be given collateral review. We have not been able to apply it consistently." *Hagler*, 97 Wn.2d at 826. In our seminal case, *Cook*, Justice Brachtenbach closely examined our existing inconsistent personal restraint petition jurisprudence and distilled a common law threshold standard that petitioners had to meet. *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 810, 792 P.2d 506 (1990). "[I]n the context of constitutional error, a petitioner must satisfy his threshold burden of demonstrating actual and substantial prejudice" or his petition would be dismissed. *Id.* (citing *In re Pers. Restraint of Haverty*, 101 Wn.2d 498, 504, 681 P.2d 835 (1984)). In the context of nonconstitutional error, "a petitioner must establish that the claimed error constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Id.* at 812. The State contends that this standard survives *Isadore* in challenges to prison discipline.

¶9 But in *Cook*, the petitioner was challenging a *conviction* on the grounds of statutory double jeopardy. *Id.* at 804. A major limitation on granting relief was our respect for the finality of judgment after litigation and full opportunity for judicial review. *Id.* at 809 (citing *In re Pers. Restraint of Hews*, 99 Wn.2d 80, 86, 660 P.2d 263 (1983)). We had no occasion to consider a claim like the one before us today, where there is no final judgment of a court, simply a decision of an executive officer brought by a petitioner who has no other meaningful mechanism for judicial review.

¶10 Generally, but not uniformly, courts in Washington have not imposed the *Cook* prima facie burden when there has been no other opportunity for review of the decision. Originally, this was done in a piecemeal fashion. *See In re Pers. Restraint of Garcia*, 106 Wn. App. 625, 629, 24 P.3d 1091, 33 P.3d 750 (2001) (challenges to prison discipline need not make prima facie showing of actual and substantial prejudice or complete miscarriage of justice); *In re Pers. Restraint of Cashaw*, 123 Wn.2d 138, 148-49, 866 P.2d 8 (1994) (same for Indeterminate Sentencing Review Board (ISRB) decisions); *In re Pers. Restraint of Shepard*, 127 Wn.2d 185, 191, 898 P.2d 828 (1995) (same for ISRB parolability decision). *But see In re Pers. Restraint of Burton*, 80 Wn. App. 573, 581, 910 P.2d 1295 (1996) (requiring challenges to prison discipline to make prima facie showing). These cases culminated in *Isadore*, where we ruled:

> In order to prevail on a collateral attack by way of personal restraint petition the petitioner must first establish that a constitutional error has resulted in actual and substantial prejudice, or that a nonconstitutional error has resulted in a fundamental defect which inherently results in a complete miscarriage of justice. These threshold requirements are justified by the court's interest in finality, economy, and integrity of the trial process and by the fact that the petitioner has already had an opportunity for judicial review. Where the petitioner has not had a prior opportunity for judicial review, we do not apply the heightened threshold requirements applicable to personal restraint petitions. Instead, the petitioner need show

only that he is restrained under RAP 16.4(b) and that the restraint is unlawful under RAP 16.4(c).

*Isadore*, 151 Wn.2d at 298-99 (citations omitted) (citing *Cook*, 114 Wn.2d at 810, 812; *Cashaw*, 123 Wn.2d at 148-49; *Garcia*, 106 Wn. App. at 628); *accord In re Pers. Restraint of Dalluge*, 162 Wn.2d 814, 817, 177 P.3d 675 (2008) ("But when, as here, direct review is not available, we apply a more lenient standard. Dalluge can prevail if he can show he is under 'unlawful' (as meant by RAP 16.4(c)) 'restraint' (as meant in RAP 16.4(b))."). Grantham contends that *Isadore* establishes the standard to be applied here.

¶11 The State disagrees, relying on *Burton*. *Burton* was decided by the Court of Appeals eight years before *Isadore* was announced. There, the Court of Appeals specifically rejected the claim that petitioners challenging prison discipline decisions do not need to make the common law prima facie showing. *Burton*, 80 Wn. App. at 581. *Burton*, like *Isadore*, relied heavily on *Cashaw*, where we said:

> The policies behind the threshold requirements are that "[']collateral relief undermines the principles of finality of litigation, degrades the prominence of the trial, and sometimes costs society the right to punish admitted offenders.[']" *Cook*, 114 Wn.2d at 809 (quoting *Hews*, 99 Wn.2d at 86). Of greatest significance is the policy in granting finality to decisions that the inmate had a previous opportunity to challenge. None of these policies justify imposition of the threshold requirements when the challenge is to a decision, such as the setting of minimum terms, from which the inmate generally has had no previous or alternative avenue for obtaining state judicial review.

*Cashaw*, 123 Wn.2d at 148-49 (citation omitted). While the *Garcia* court found that dispositive against imposing the *Cook* threshold burdens in challenges to prison discipline, *Garcia*, 106 Wn. App. at 629 & n.5, the *Burton* court did not, *Burton*, 80 Wn. App. at 585. Instead, the *Burton* court found the *Cashaw* factors *favored* imposing the prima facie

threshold showing on challenges to prison discipline, on the ground that prison officials needed to be able to impose discipline swiftly and finally to maintain order, that prison discipline hearings were incredibly numerous, and that there was a right to appeal to the prison superintendent. *Burton*, 80 Wn. App. at 584. Additionally, the *Burton* court believed that the heightened threshold showing was more consistent with the prisoner's unchallenged substantive burden. *Id.* at 582-83. Under that substantive standard, "review of prison disciplinary proceedings is properly limited to a determination of whether the action taken was so arbitrary and capricious as to deny the petitioner a fundamentally fair proceeding." *In re Pers. Restraint of Reismiller*, 101 Wn.2d 291, 294, 678 P.2d 323 (1984).

■ ■ ¶12 Again, ultimately, the purpose of judicial review of restraint, be it by writs of habeas corpus or by personal restraint petitions, is to protect against governmental oppression and power exercised without law. *Fay*, 372 U.S. at 400-01, 408. The judiciary pauses, however, to disturb a settled judicial decision where the petitioner has already had an opportunity to appeal to a disinterested judge. *Cook*, 114 Wn.2d at 809. That limiting principle does not apply to decisions made by executive officers and agents, even if other executive officers and agents stand ready to review them. *Isadore*, 151 Wn.2d at 299. Because we apply the common law prima facie standard to protect the finality of appealable *judicial* decisions, not executive ones, we explicitly overrule *Burton* and hold that a petitioner seeking relief via a personal restraint petition from prison discipline where no prior judicial review has been afforded is not required to make a prima facie case of constitutional error and actual and substantial prejudice, or nonconstitutional error and total miscarriage of justice, as a precondition to relief. *Isadore* controls.

■ ■ ¶13 However, that does not end our inquiry. Prisoners facing discipline are not entitled to the full panoply of constitutional protections afforded defendants

facing criminal charges.[4] *Arment v. Henry*, 98 Wn.2d 775, 778, 658 P.2d 663 (1983). We will reverse a prison discipline decision only upon a showing that it was so arbitrary and capricious as to deny the petitioner a fundamentally fair proceeding so as to work to the offender's prejudice. *Reismiller*, 101 Wn.2d at 294; *see also In re Pers. Restraint of Gronquist*, 138 Wn.2d 388, 396, 978 P.2d 1083 (1999). This is a heightened standard based on the particular type of executive action we are asked to review. Prison discipline cases are significantly different from other administrative proceedings that can result in the loss of liberty. "A prison is 'a tightly controlled environment populated by persons who have chosen to violate the criminal law, many of whom have employed violence to achieve their ends.' " *Reismiller*, 101 Wn.2d at 294 (quoting *Dawson v. Hearing Comm.*, 92 Wn.2d 391, 396, 597 P.2d 1353 (1979)). Offenders facing discipline are not entitled to the full panoply of constitutional procedures given criminal defendants at trial. *Id.* at 294-95. Prison discipline is an essential function of the day to day management of a safe and secure correctional institution. In 1997 alone, the Department of Corrections reported 31,629 general infractions and 22,143 serious infractions in its correctional facilities. *Gronquist*, 138 Wn.2d at 398 n.8. A prisoner is entitled to only minimum due process protections, which include notice and an opportunity to provide evidence and call witnesses "when not

---

[4] As Justice Dolliver summarized the protections afforded at such proceedings:

The case law can be stated succinctly: (1) Some minimum due process is required in probation or parole revocation hearings: *Morrissey v. Brewer*, 408 U.S. 471, 489, 33 L. Ed. 2d 484, 92 S. Ct. 2593 (1972); *Wolff v. McDonnell*, 418 U.S. 539, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1974); and *Monohan v. Burdman*, 84 Wn.2d 922, 530 P.2d 334 (1975). (2) There is no constitutional requirement in probation or parole revocation hearings that in all cases indigent prisoners must be provided with counsel, but exceptions are available on a case-by-case basis. *Gagnon v. Scarpelli*, 411 U.S. 778, 36 L. Ed. 2d 656, 93 S. Ct. 1756 (1973). (3) A lesser standard of due process is required in disciplinary proceedings when a prisoner is already incarcerated rather than on probation or parole. Not only is the sanction in prison disciplinary hearings "qualitatively and quantitatively different from the revocation of parole or probation" but the State also has a far different stake in prison disciplinary hearings than in the revocation of probation or parole. *Wolff v. McDonnell, supra* at 561-62.

*Arment v. Henry*, 98 Wn.2d 775, 778, 658 P.2d 663 (1983).

unduly hazardous to institutional safety and correctional goals," and to receive a written statement of the evidence relied upon and the reasons for the discipline. *Id.* at 396-97 (citing *Dawson*, 92 Wn.2d at 397). There has to be at least some evidence to affirm the discipline. *Reismiller*, 101 Wn.2d at 295 (citing *Pierce v. Dep't of Soc. & Health Servs.*, 97 Wn.2d 552, 557, 646 P.2d 1382 (1982)); *see also Gronquist*, 138 Wn.2d at 397 n.7 (quoting *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 455-56, 105 S. Ct. 2768, 86 L. Ed. 2d 356 (1985) ("Factual determinations of prison officials must stand if there is 'some evidence' in the record to support the prison disciplinary decision.").

¶14 Grantham argues that the infraction report did not comply with certain prison regulations and therefore he was denied due process. Under the rules:

> (1) In the event of a serious infraction, the staff member who discovers such violation shall prepare and submit an infraction report. . . . The infraction report must include:
>
> . . . .
>
> (c) The time and place of the incident;
>
> (d) The names of witnesses, victims, and other persons involved;
>
> . . . .
>
> (h) Copies of any relevant documentation or supplemental reports. Confidential information and the identities of confidential informants shall not be included.

WAC 137-28-270. Grantham contends that the investigating officer's report (quoted verbatim above) did not comply with the rule because it did not list the time and place of the incident, beyond "Tacoma," and did not state the time and date of the phone call that the officer listened to and believed contained coded references to drugs. Grantham also argues that the lack of specificity is a violation of the WACs and is the moral equivalent of violation of ISRB regulations, and thus, he is entitled to relief under *Cashaw*, 123 Wn.2d at 140, where we found that a petitioner was entitled to relief because the ISRB had failed to follow its own regulations.

¶15 We disagree. Under the facts of this case, the report complied with the requirements of WAC 137-28-270. Given that the hand-off of the drugs and tobacco never happened, it is not unreasonable that the time, place, and date was vague. Further, the infraction report did not prevent Grantham from mounting a defense. Grantham was informed of the charges against him and the factual basis for those charges, and given an opportunity to defend himself.

¶16 The one piece of evidence that most closely tied Grantham to the contraband was the recorded conversation between him and his brother. We are inclined to agree that Grantham should have been allowed to listen to the recording of the incriminating phone conversation. However, he was not denied a fundamentally fair proceeding. The contents of the conversation were described and Grantham had an opportunity to make his point to the hearing examiner that the investigating officer did not hear him actually use the word "tobacco" or "marijuana."[5] The critical evidence was the fact that Grantham asked his brother to buy coffee and make sure he had it ready for Sunday, and that his brother gave contraband concealed in a coffee can to a corrections officer who agreed to bring it into the prison. The phone conversation was not the incident Grantham was disciplined for; he was disciplined for attempting to introduce drugs and tobacco into the prison. There is sufficient evidence connecting Grantham to those offenses.[6]

---

[5] We are mindful that prison discipline consumes a significant amount of the public's resources. See Gronquist, 138 Wn.2d at 398 n.8. According to the department, in 1997 "total staff time processing an average general infraction is estimated at approximately one hour, and for an average serious infraction approximately two hours." Id. Given the time constraints, it is not necessarily arbitrary and capricious for a hearing examiner not to listen to the call.

[6] The State argues that Grantham has not preserved a challenge based on an alleged violation of the procedural regulations, claiming he did not raise it in his personal restraint petition or motion for discretionary review. However, Grantham does specifically allege violation of WAC 137-28-270 in his original pro se brief in support of his personal restraint petition. Br. of Pet'r at 4. While his pro se motion for review does not use the term "violation of procedural regulations," he quotes the WAC and argues that Baxter's report did not comply. Am. Mot. for Discretionary Review at 6-7. That is sufficient to preserve the issue.

¶17 While we agree with Grantham that prisoners challenging prison discipline need not make a prima facie case of constitutional error and actual and substantial prejudice or nonconstitutional error and total miscarriage of justice, that simply means that we more easily reach the substantive question. However, when applying the well established substantive law, the prison's disciplinary decision was not so arbitrary and capricious as to deny a fundamentally fair proceeding. Grantham was informed of the charges against him and given an opportunity to defend himself. He has not shown that he was denied a fundamentally fair proceeding or that he was prejudiced by the process he received.

## CONCLUSION

¶18 We hold that prison inmates challenging prison discipline do not have to make a prima facie case of prejudice to get review. However, they still must show that the disciplinary hearing was so arbitrary and capricious as to deny them a fundamentally fair proceeding so as to work to the prisoner's prejudice. Grantham has not met this standard. He received sufficient notice of the allegations against him and was given an opportunity to defend himself. We affirm the Court of Appeals in result and dismiss the petition.

MADSEN, C.J., and C. JOHNSON, OWENS, FAIRHURST, J.M. JOHNSON, and STEPHENS, JJ., concur.

¶19 ALEXANDER, J. (dissenting) — I agree with the majority insofar as it holds that a prison inmate challenging prison discipline does not have to make out a prima facie case of prejudice in order to obtain review (the *Isadore*[7] standard). I also agree that a prisoner who is facing discipline is not entitled to the full panoply of constitutional protections afforded defendants facing criminal charges.

¶20 Finally, I agree that we should reverse a prison discipline decision only when it is shown that the decision

---

[7] *In re Pers. Restraint of Isadore*, 151 Wn.2d 294, 88 P.3d 390 (2004).

was so arbitrary and capricious as to deny the prisoner a fundamentally fair proceeding and that the allegedly offending prisoner suffered prejudice as a result. Majority at 215. Looking at the case under this standard, it is apparent to me that the failure of the prison officials to allow James Grantham to hear the recording of the allegedly incriminating telephone conversation was fundamentally unfair and highly prejudicial to him. Indeed, the majority concedes that Grantham "should have been allowed to listen to the recording." *Id.* at 217. To say that the telephone conversation was critical evidence against Grantham is an understatement. It was essentially the only evidence against him and he should have been allowed to hear it. At the very least, the hearing officer should have listened to the recording before he made his ruling, and it was arbitrary and capricious for him to not do so. The majority responds by saying that Grantham was not prejudiced by these errors because a testifying officer heard Grantham utter the "critical" words that his brother was to "buy coffee and make sure he had it ready for Sunday." *Id.* My response is that there would certainly be prejudice if Grantham was not a party to the phone call or if he cannot be heard to utter the allegedly incriminating words during the call. Only by listening to the recorded phone call can one determine if Grantham was a party to the call and/or that he said the incriminating words. That is why it was important for the recording of the call to be heard by Grantham and the hearing officer before any decision was made.

¶21 I will concede that it is true, as the majority indicates, that "prison discipline consumes a significant amount of the public's resources." *Id.* at 217 n.5 (citing *In re Pers. Restraint of Gronquist*, 138 Wn.2d 388, 398 n.8, 978 P.2d 1083 (1999)). That fact, however, should not excuse a failure of the prison discipline system to take what surely would have been a brief amount of time to fully examine the critical evidence against Grantham.

SANDERS, J., concurs with ALEXANDER, J.

Reconsideration denied April 28, 2010.