IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 36109-8-III |
| | ) | (consolidated with |
| Respondent, | ) | No. 36425-9-III) |
| | ) | |
| v. | ) | |
| | ) | |
| MARIA FRANCISCA CONTRERAS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | |
| | ) | |
| In the Matter of the Personal Restraint of | ) | |
| | ) | |
| MARIA FRANCISCA CONTRERAS, | ) | |
| | ) | |
| Petitioner. | ) | |

SIDDOWAY, J. — Post-*Padilla v. Kentucky*,[1] we are presented with another contention that a criminal defense lawyer provided ineffective assistance of counsel by failing to advise a client of immigration consequences of a guilty plea. Maria Francisca Contreras seeks relief from personal restraint in the form of her 2003 conviction of welfare fraud—a type of first degree theft that requires willfully fraudulent conduct— supported by a declaration that her trial lawyer failed to advise her that the plea would

_____
[1] 559 U.S. 356, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010).

render her inadmissible and ineligible to file for cancellation of removal and adjustment of status, her "one chance to remain in the United States." Personal Restraint Petition (PRP) at 5.

Given a persuasive showing that Ms. Contreras's lawyer knew or could have determined that the adverse immigration consequence was material to Ms. Contreras, that the consequence was truly clear, that the lawyer failed to research and advise Ms. Contreras of the clear consequence, and a reasonable reason to believe that Ms. Contreras would have taken her chances at trial, we grant Ms. Contreras her requested relief and remand for proceedings consistent with this opinion.

## FACTS AND PROCEDURAL BACKGROUND

In 2003, Maria Francisca Contreras was charged with first degree theft (welfare fraud), first degree identity theft, and witness tampering. The charges arose from Ms. Contreras's application for and receipt of food stamps and public assistance, which she supported with false, sworn, representations. The Department of Social and Health Services discovered after several years that Ms. Contreras's husband was employed during the period she received public assistance and that Social Security numbers she used did not belong to her husband or herself. When confronted, Ms. Contreras admitted that her husband signed the documents because she told him they were for medical coupons.

Gail Siemers was appointed to represent Ms. Contreras, who originally entered a plea of not guilty. Two months later, Ms. Contreras pleaded guilty to the count of first degree theft under RCW 9A.56.030(1)(a) and 74.08.331. The latter provision imposes criminal liability for only willful or fraudulent conduct.

The plea agreement identified the standard range for Ms. Contreras as 0-60 days and the State's recommendation that she serve 15 days, converted to work crew or community service. It included the State's recommendation to dismiss the other two counts if Ms. Contreras paid back half the money she obtained in public assistance by a date prior to the change of plea hearing (half being $2,149.50).

Consistent with a longstanding statutory requirement, Ms. Contreras's statement on plea of guilty disclosed that for a noncitizen, pleading guilty to a crime "is grounds for deportation, exclusion from admission to the United States, or denial of naturalization." Clerk's Papers (CP) at 25. While Ms. Contreras reads and writes English, she was provided a Spanish interpreter for her change of plea hearing. The interpreter signed a declaration stating that Ms. Contreras indicated her understanding that her plea "could result in deportation if the Immigration and Naturalization Service pursued such actions," and that she faced "the potential for deportation." CP at 31. It contained Ms. Siemers's acknowledgment that she had read and discussed the statement with Ms. Contreras and believed Ms. Contreras was competent and fully understood the statement.

3

Nos. 36109-8-III; 36425-9-III
*State v. Contreras*; *In re Pers. Restraint of Contreras*

At the change of plea hearing, Ms. Contreras affirmed that she had read and signed the plea agreement and did not have any questions. After questioning her and learning that Ms. Contreras was not a citizen of the United States or legally in the country, the court asked if she understood that by pleading guilty to this charge, the conviction "may affect your ability to stay in this country?," to which she answered, "Yes." CP at 63. The trial court accepted Ms. Contreras's guilty plea.

At Ms. Contreras's sentencing hearing, a letter she had written was read to the trial court by the interpreter. It stated, "I want to ask you not to be too hard on me when you impose judgment because I know that I did something bad, but I had very great reasons." CP at 69. The letter said she had needed money to pay for babysitters for her children while she attended school to obtain her GED[2] and CNA,[3] because she "wanted to get ahead to be able to take care of my children." *Id.* It asked,

> Judge, sir, please help me. I want to pay the State, but in payments because they helped me a lot. But *I don't want to have a criminal record because maybe I'll never be able to get my papers fixed to be able to stay in this country. And all the time that I was in school will not count and that was through a lot of work and a lot of effort.*

CP at 69-70 (emphasis added).

Ms. Siemers also addressed Ms. Contreras's concern about immigration consequences, telling the court that "Maria has been very concerned about how this is

---

[2] General equivalency diploma.
[3] Certified nursing assistant.

4

going to make her future turn out.  She does understand that she could very well be deported."  CP at 70.  She told the court, "I have referred her to the immigration lawyers to address that problem even before we entered the plea."  *Id.*

It was revealed at the plea hearing that Ms. Contreras had so far been unable to pay the $2,149.50 required as a condition of the plea, but the State had given her one more day to pay, failing which it would withdraw the plea agreement.  By the time of sentencing, she had paid $2,000.00 and she delivered another $100.00 in cash at sentencing.  The prosecutor accepted it as sufficient, stating that the State "appreciate[d] the effort that it took to come up with . . . $2,100 in cash to pay half the restitution." CP at 72.

The trial court accepted the plea agreement and sentenced Ms. Contreras to 15 days on work crew.  In 2004, Ms. Contreras completed her work crew requirements.  She completed payments of the remaining restitution and LFOs[4] (she owed a remaining principal amount of $3,642.50) and obtained a certificate of discharge in August 2013.

In August 2014, Ms. Contreras moved for relief from her judgment on the basis that she received ineffective assistance of counsel under *Padilla*.  The trial court denied the motion, stating in its order that she had been properly advised as *Padilla* had not been decided at the time of her plea and sentencing, the United States Supreme Court had held

---

[4] Legal financial obligations.

5

that *Padilla* did not apply retroactively, her collateral attack was untimely under RCW

10.73.090 and 10.73.100, and she had not demonstrated a deficiency in the guilty plea

statement or judgment that would justify setting either aside.

In 2015, the Washington Supreme Court decided that while *Padilla* created a new

rule under federal law for retroactivity purposes, Washington statutes had long required

that criminal defendants be advised of immigration consequences of a guilty plea, so

*Padilla* simply applied a Washington lawyer's duty to a specific concern. *In re Pers.*

*Restraint of Yung-Cheng Tsai*, 183 Wn.2d 91, 100-03, 351 P.3d 138 (2015). It therefore

*would* apply retroactively to Washington defendants. Addressing the distinct issue of

whether *Padilla* was a retroactively applicable "significant change in [the] law" that

overcomes the one-year time bar to collateral relief provided by RCW 10.73.100(6), the

court held that it was. *Tsai*, 183 Wn.2d at 103. This is because several Washington

appellate decisions issued before *Padilla* appeared to foreclose the possibility that the

unreasonable, prejudicial failure to provide advice on deportation consequences could

ever be ineffective assistance of counsel. *Id.* at 105.

In 2018, represented by new counsel, Ms. Contreras moved to vacate her sentence

and withdraw her guilty plea, again asserting ineffective assistance of counsel and

arguing that it was now clear her motion was not time-barred. The State opposed the

motion solely on the basis that Ms. Contreras had been informed of the possibility of

immigration consequences at the plea hearing and at sentencing. In response to the

6

State's objection, Ms. Contreras submitted a declaration in which she declared that Ms.

Siemers

> never talked to me about my immigration status. She never talked with me about whether my conviction would be any definite problem for keeping my immigration status. The only things I was ever told about immigration consequences by the court was in the papers that I signed with the court's interpreter. I remember him, because there were some words that he used that I did not understand. These may have been words that were to do with court that I would not have ever used before.
>
> . . . The forms that I signed were what the interpreter had told me—that being deported wasn't an automatic thing that would be the result of my guilty plea.

CP at 188.

The trial court denied Ms. Contreras's motion, citing the following grounds in its

order:

1) [Ms. Contreras] affirmed at her change of plea that she understood she faced immigration consequences due to her citizenship status. At sentencing, [Ms. Contreras] additionally reflected she was concerned about immigration consequences, but she agreed to proceed. [Ms. Contreras's] attorney made a record that [Ms. Contreras] had been referred to an immigration attorney prior to change of plea and was aware of the potential immigration consequences she faced. Therefore, [Ms. Contreras] was properly advised of the immigration consequences of the plea, consistent with *Padilla* . . . and *State v. Sandoval*, 171 Wn.2d 163, 249 P.2d 1015 (2001).

2) [Ms. Contreras] has failed to show any deficiency in either the Guilty Plea statement or the Judgment and Sentence that would justify setting the Judgment aside pursuant to CrR 7.8.

CP at 193-94.

7

Ms. Contreras appealed. Several months later, she filed a personal restraint petition seeking relief for Ms. Siemers's allegedly ineffective assistance. Her motion to consolidate her direct appeal and the PRP was granted.

Ms. Contreras's PRP lacked a declaration from Ms. Siemers, although it explained efforts to obtain a declaration from her. In responding to the PRP, the State obtained and filed a declaration from Ms. Siemers. In it, Ms. Siemers asserted that she, the interpreter, and the trial court all informed Ms. Contreras about the "*possible* consequences of a conviction" and "the issue of *possible* removal from the United States," and that Ms. Contreras "would have had to tell me through the interpreter, repeatedly, that she understood the *possible* ramification of deportation." Resp't's Br., App. A (Decl. of Siemers at 2-3) (emphasis added). The declaration did not respond to Ms. Contreras's charge that Ms. Siemers "never talked to me about . . . whether my conviction would be any *definite* problem for keeping my immigration status." CP at 188 (emphasis added).

ANALYSIS

We address our primary attention to Ms. Contreras's PRP. Where relevant facts about counsel's representation do not appear in the trial court record, necessitating a PRP, a petitioner "has not 'already had an opportunity to appeal to a disinterested judge,'" and a requirement to show actual and substantial prejudice from a constitutional error does not apply. *Sandoval*, 171 Wn.2d at 168-69 (quoting *In re Pers. Restraint of Grantham*, 168 Wn.2d 204, 214, 227 P.3d 285 (2010)). The petitioner's burden is to show only that

8

she is entitled to relief for one of the reasons listed in RAP 16.4(c). *Id.* (citing *Grantham*, 168 Wn.2d at 214). A petitioner may not rely on conclusory allegations, but must establish facts entitling her to relief with a preponderance of competent, admissible evidence. *In re Pers. Restraint of Ruiz-Sanabria*, 184 Wn.2d 632, 636, 362 P.3d 758 (2015).

Effective assistance of counsel is guaranteed by both the federal and state constitutions. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Mierz*, 127 Wn.2d 460, 471, 901 P.2d 286 (1995). To demonstrate ineffective assistance of counsel, a defendant must show two things: "(1) defense counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, i.e., there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995) (emphasis omitted) (citing *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987)).

The State opposes Ms. Contreras's request for relief on grounds that because she failed to appeal the trial court's denial of her CrR 7.8 motion in 2014, that order is law of the case and forecloses relitigation of her *Padilla* claim. Alternatively, it argues that she received effective assistance of counsel.

I.      THE LAW OF THE CASE DOCTRINE DOES NOT FORECLOSE MS. CONTRERAS'S
        PETITION

The State cites several reported decisions in support of its argument that because

Ms. Contreras failed to appeal the 2014 denial of her CrR 7.8(b) motion, the denial order

is law of the case. All are inapposite. Two—*In re Personal Restraint of Brown*, 143

Wn.2d 431, 445, 21 P.3d 687 (2001) and *In re Personal Restraint of Taylor*, 105 Wn.2d

683, 688, 717 P.2d 755 (1986)—deal with the ability of a petitioner to seek review of an

issue previously raised and rejected on direct appeal. The presently pending appeal is

Ms. Contreras's first direct appeal. Moreover, a petitioner is able to renew a ground for

relief that was raised and rejected on direct appeal if the interests of justice require

reconsideration, and the interests of justice are served if there has been an intervening

material change in the law. *State v. Yates*, 177 Wn.2d 1, 17, 296 P.3d 872 (2013).

The third case cited by the State—*Lutheran Day Care v. Snohomish County*, 119

Wn.2d 91, 113, 829 P.2d 746 (1992)—speaks of the law of the case doctrine generally,

identifying three senses in which the term "law of the case" is used. The court points out

that the doctrine was "entirely inapplicable" to the issues on appeal because two senses in

which "law of the case" is used require a prior appellate decision and the third sense

requires jury instructions. The same is true here. There is no prior appellate decision that

the State points to as law of the case. No jury instructions are at issue.

10

The relevant law, which permits review of the ineffective assistance of counsel issue raised by Ms. Contreras's petition, is found in RCW 10.73.140 and RAP 16.4(d). RCW 10.73.140 provides in relevant part that the Court of Appeals will not consider a ground for review that was raised and rejected in a "previously filed . . . petition for personal restraint." RAP 16.4(d) similarly provides that no more than one "petition" for similar relief on behalf of "the same petitioner" will be entertained without good cause shown. Unlike the prior filing of a PRP, a petitioner's prior filing of a postconviction motion for collateral relief with the trial court does not require us to reject a first PRP. *In re Pers. Restraint of Bailey*, 141 Wn.2d 20, 28, 1 P.3d 1120 (2000).

II. MS. CONTRERAS DEMONSTRATES INEFFECTIVE ASSISTANCE OF COUNSEL

As Ms. Contreras emphasizes, she admits receiving and being aware of the disclosure of *possible* immigration consequences contained in her statement on plea of guilty. And her own letter to the trial court expressed her fear that "maybe" she would not be able to get her papers fixed to be able to stay in the country.

She argues that effective assistance of counsel required more: it required advice that the type of first degree theft to which she was pleading guilty not only "maybe" would prevent her from getting her "papers fixed," it would *clearly* prevent her from getting her papers fixed. She contends that the certainty of that consequence, if known, would have caused her to take her chances at trial.

*Deficient representation*

The Sixth Amendment right to effective assistance of counsel encompasses the plea process. *Sandoval*, 171 Wn.2d at 169. Counsel's faulty advice can render the defendant's guilty plea involuntary or unintelligent. *Id.*

As early as the spring of 1983, the Washington legislature recognized that a criminal conviction could have significant immigration consequences and enacted legislation requiring that before accepting a plea of guilty to a criminal offense, Washington courts must determine that the defendant has been advised that for noncitizen defendants, potential consequences of conviction are deportation, exclusion from admission to the United States, or denial of naturalization. LAWS OF 1983, ch. 199, § 1. It provided that beginning in September 1983, if a defendant faced such consequences without having received the required warning, "the court, on defendant's motion, shall vacate the judgment and permit the defendant to withdraw the plea of guilty and enter a plea of not guilty." RCW 10.40.200(2).

Seventeen years later, the United States Supreme Court held in *Padilla* that a steady expansion of deportable offenses, a 1952 circumscription and the 1990 elimination of sentencing judges' conclusive authority to decide whether a particular conviction should be disregarded as a basis for deportation, and the 1996 elimination of the Attorney General's authority to grant discretionary relief from deportation, had "dramatically raised the stakes of a noncitizen's criminal conviction." *Padilla*, 559 U.S. at 361-64. It

12

held that "[f]or at least the past 15 years," the weight of prevailing professional norms

had responded. *Id.* at 372, 367. Observing that "'[p]reserving the client's right to remain

in the United States may be more important to the client than any potential jail

sentence,'" and "[t]he importance of accurate legal advice for noncitizens accused of

crimes has never been more important," the Court held that competent counsel is required

by the Sixth Amendment to the United States Constitution to advise a client facing

criminal charges about the risk of deportation. *Id.* at 364, 368 (quoting *Immigration &*

*Naturalization Serv. v. St. Cyr*, 533 U.S. 289, 322, 121 S. Ct. 2271, 150 L. Ed. 2d 347

(2001)).

Because the Court recognized that "[i]mmigration law can be complex," "[s]ome

members of the bar who represent clients facing criminal charges . . . may not be well

versed in it," and "[t]here will . . . undoubtedly be numerous situations in which the

deportation consequences of a particular plea are unclear or uncertain," the Court

announced the following standard for assessing a criminal defense lawyer's duty:

> When the law is not succinct and straightforward . . . a criminal defense
> attorney need do no more than advise a noncitizen client that pending
> criminal charges may carry a risk of adverse immigration consequences.
> But when the deportation consequence is truly clear, . . . the duty to give
> correct advice is equally clear.

*Id.* at 369 (footnote omitted).

In *Sandoval*, 171 Wn.2d at 174 n.3, our Supreme Court declined to spell out a

criminal defense lawyer's duty to inquire about, research, and advise a client about

13

immigration consequences of a conviction where those consequences may be a client's

priority. Amici had asked the Court to hold that a constitutionally competent criminal

defense attorney handling a noncitizen defendant's case should (1) investigate the facts;

(2) discuss the defendant's priorities; (3) research the immigration consequences of the

charged crime and the plea alternatives, and advise the defendant accordingly; and (4)

defend the case in light of the client's interests and the surrounding circumstances. *Id.*

The Court explained that because Mr. Sandoval's ineffective assistance claim was

narrowly focused on specific advice he received, amici's requested holding exceeded the

scope of the case. The Court stated it would "consider these issues if and when they are

squarely presented." *Id.* At least some of those issues are presented here.

Several factors contribute to our conclusion that Ms. Contreras has made an

adequate showing of deficient representation.

1. Ms. Siemers's preparation of a list of immigration attorneys was not "the very best advice a criminal attorney can give"

At sentencing, Ms. Siemers told the court that Ms. Contreras "has been very

concerned about how this is going to make her future turn out," and said, "I have referred

her to the immigration lawyers to address that problem even before we entered the plea."

CP at 70. One might infer from the statement that "by refer[ing] her . . . to address that

problem" Ms. Siemers had satisfied herself that Ms. Contreras had been able to consult

14

with an immigration lawyer and obtain the needed advice. *Id.* If so, that could be, as the State argues, "the very best advice a criminal attorney can give." Resp't's Br. at 22.

But there is no evidence that Ms. Contreras was able to hire an immigration lawyer.[5] Ms. Siemers's declaration in response to the PRP clarifies what she meant by making a referral, stating, "I . . . made a list for clients of immigration attorneys in case the client wanted further information on immigration in general." Resp't's Br., App. A (Decl. of Siemers at 3).

The record makes clear that at the time she was charged and pled guilty, Ms. Contreras was indigent. Ms. Siemers was her *court-appointed* lawyer. Ms. Siemers informed that court that Ms. Contreras at that time "has five kids and no husband" and was in need of child support enforcement services.[6] CP at 73. Ms. Contreras's letter to the trial court explained that she wrongly obtained public assistance "because it was the only money I could have and without that money, I wouldn't have been able to afford a baby-sitter to take care of my children for me to go to school." CP at 69. Ms. Siemers was aware that the guilty plea she negotiated required Ms. Contreras to come up with $2,149.50 in restitution immediately, and that Ms. Contreras struggled to comply and

---

[5] The implication of her 2018 declaration is that she did not consult an immigration lawyer. The declaration states that if she had understood the consequence of her plea she would have "done anything I could have to find a lawyer who could save me from giving up any chances to become a US citizen." CP at 188.

[6] Ms. Contreras's own declaration states, "I have 4 children that I have been raising without any help." *Id.*

15

came up short. The prosecutor accepted $2,100.00, "appreciat[ing] the effort that it took to come up with" that amount. CP at 72.

When a noncitizen criminal defendant has no money to hire an immigration lawyer, for her criminal lawyer to provide a list of names of immigration lawyers is not "the very best advice a criminal attorney can give." For immigration consequences that the criminal defense lawyer knows or should know are material to her noncitizen client, the lawyer has a duty to conduct enough research to determine if the consequences are clear, and if they are clear, has a duty to provide that information to the client.

> 2. The statutory warnings contained in the statement on plea of guilty were not sufficient

We agree with the observation in Ms. Contreras's reply brief that when Ms. Siemers asserts in her declaration that Ms. Contreras was adequately advised, she is referring to the general immigration warnings provided in the statement on plea of guilty. For more than 25 years, a failure to give those warnings has automatically, statutorily, entitled a defendant facing adverse immigration consequences to withdraw a guilty plea. RCW 10.40.200(2). Because those warnings are crafted to apply to *all* noncitizen defendants, however, they do not provide a criminal defendant with helpful information on clear consequences that might apply to him or her. The general statutory warnings do not discharge a defense lawyer's Sixth Amendment duty to provide advice on clear and material consequences that are faced by the lawyer's client.

16

3. The record demonstrates that Ms. Siemers was aware that being able to remain in the United States was material to Ms. Contreras

The central point of Ms. Contreras's letter to the sentencing judge was her fear about the uncertainty of immigration consequences. She told the judge she did not want to have a criminal record because "*maybe* I'll never be able to get my papers fixed to be able to stay in this country." CP at 69 (emphasis added). Ms. Siemers's own statements at sentencing reveal her knowledge that Ms. Contreras was distressed at the uncertainty of her situation, telling the court that "Maria has been very concerned about how this is going to make her future turn out," and that Ms. Contreras was originally enthusiastic about taking the plea, but "[t]hen she stepped back a little bit, so I don't know if she was aware of how serious this is." CP at 70.

4. Ms. Contreras demonstrates that it was clearly foreseeable, and not a mere possibility, that the type of theft to which she pled guilty would prevent her from establishing legal residency in the United States

Welfare fraud under RCW 74.08.331(1), which was the type of theft to which Ms. Contreras pleaded guilty under RCW 9A.56.030, requires proof of willfully false statements, representations or impersonations; willful failures to reveal any material fact, condition or circumstance affecting eligibility or need for assistance; willful failures to promptly notify the county office of changes in status or circumstances affecting eligibility or need for assistance; or any other fraudulent device in obtaining or attempting to obtain public assistance. Ms. Contreras does not contend that her

17

conviction subjected her to automatic deportation as an aggravated felony or a "crime involving moral turpitude" for which a sentence of a year or more could have been imposed. *See* 8 U.S.C. § 1227(a)(2)(A)(i), (iii). She does contend, however, that the law was truly clear at the time of her guilty plea that welfare fraud under RCW 74.08.331(1) is a "crime involving moral turpitude," the conviction for which is a recognized ground of immigration inadmissibility and makes her ineligible to apply for cancellation of removal and adjustment of status. *See* 8 U.S.C. § 1229b(b)(1).

Under the Immigration and Naturalization Act, "any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of . . . a crime involving moral turpitude (other than a purely political offense) . . . is inadmissible." 8 U.S.C. § 1182(a)(2)(A)(i)(I). Congress has not defined "crime involving moral turpitude," but longstanding controlling authority held at the time of Ms. Contreras's guilty plea that a crime in which fraud is an ingredient involves moral turpitude. *Jordan v. DeGeorge*, 341 U.S. 223, 229, 71 S. Ct. 703, 95 L. Ed. 886 (1951) ("[F]raud has consistently been regarded as such a contaminating component in any crime that American courts have, without exception, included such crimes within the scope of moral turpitude."); *and see Burr v. Immigration & Naturalization Serv.*, 350 F.2d 87, 91 (9th Cir. 1965) ("Crimes in which fraud is an ingredient have always been regarded as involving moral turpitude.").

18

Whether a crime involves moral turpitude depends on the inherent nature of the crime, as defined in the statute concerned, rather than the circumstances surrounding the particular transgression. *Okabe v. Immigration & Naturalization Serv.*, 671 F.2d 863, 865 (5th Cir. 1982). Whether a statute defines a crime involving moral turpitude is a question of law, reviewed de novo. *United States v. Yin*, 935 F.2d 990, 1003 (9th Cir. 1991). Our research into cases decided before Ms. Contreras entered her guilty plea in November 2003 reveals only cases in which it was either conceded or determined that welfare fraud is a crime involving moral turpitude. *See Miller v. United States Immigration & Naturalization Serv.*, 762 F.2d 21, 22 (3d Cir. 1985) (concession that welfare fraud is a crime involving moral turpitude (hereafter sometimes CIMT)); *United States v. Concepcion*, 795 F. Supp. 1262, 1275 (E.D.N.Y. 1992) (guilty pleas to fraudulently obtaining public assistance from programs for the poor were pleas to CIMT); *Mendoza v. Immigration & Naturalization Serv.*, 16 F.3d 335, 336 (9th Cir. 1994) (effort to terminate deportation proceedings on other grounds after Board of Immigration Appeals affirmed decision that conviction for welfare fraud, a CIMT, rendered petitioner deportable); *Flores v. Immigration & Naturalization Serv.*, 66 F.3d 1069, 1073 (9th Cir. 1995), *superseded on reh'g*, 74 F.3d 1245 (1996) (petitioner's conviction for welfare fraud precluded her from establishing the "good moral character" required to apply for a suspension of deportation); *Diaz v. Reno*, No. 97 CIV. 6580 (MBM), 2000 WL 502852, at *5 (S.D.N.Y. Apr. 26, 2000) (undisputed that petitioner's conviction for welfare fraud

19

scheme was conviction of a CIMT; he petitions for relief on other grounds). *See also Rodriguez v. Ashcroft*, 95 F. App'x 208, 211 (9th Cir. 2004) (affirming Board of Immigration Appeal's conclusion that petitioner's welfare fraud conviction constituted a CIMT). The State has not brought any contrary authority to our attention.

In Ms. Siemers's declaration, she says she spent a good deal of time finding her old notes and reviewing the court file. She does not say that during her representation of Ms. Contreras she ever researched or otherwise investigated whether Ms. Contreras's guilty plea would have clear, material immigration consequences. "Reasonable conduct for an attorney includes carrying out the duty to research the relevant law." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009) (citing *Strickland*, 466 U.S. at 690-91). Silence on matters that are of great importance to a lawyer's client, when answers are readily available, is "fundamentally at odds with the critical obligation of counsel to advise the client of 'the advantages and disadvantages of a plea agreement.'" *Padilla*, 559 U.S. at 370 (quoting *Libretti v. United States*, 516 U.S. 29, 50-51, 116 S. Ct. 356, 133 L. Ed. 2d 271 (1995)).

III.   MS. CONTRERAS HAS DEMONSTRATED ACTUAL AND SUBSTANTIAL PREJUDICE

To demonstrate actual and substantial prejudice, "'a defendant challenging a guilty plea must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *Sandoval*, 171 Wn.2d at 174-75 (quoting *In re Pers. Restraint of Riley*, 122 Wn.2d 772, 780-81, 863

P.2d 554 (1993)). "[A] 'reasonable probability' is lower than a preponderance standard." *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017) (citing *Strickland*, 466 U.S. at 694; *State v. Jones*, 183 Wn.2d 327, 339, 352 P.3d 776 (2015)). "Rather, it is a probability sufficient to undermine confidence in the outcome." *Id.* (citing *Strickland*, 466 U.S. at 694). It is demonstrated if a petitioner can convince the court that a decision to reject the plea bargain would have been rational under the circumstances. *Sandoval*, 171 Wn.2d at 175.

Ms. Contreras now swears that "[i]f I had known that by pleading guilty would just get me deported forever, I would have done anything I had to to find a lawyer who could save me from giving up any chances to become a US citizen." CP at 188. This current claim is consistent with the concern about the ability to remain in the United States that she expressed at the sentencing hearing. The importance to her of the opportunity to remain in the United States is further supported by the time and effort she invested in earning her GED and CNA, and her later payment in full of her LFOs in order to obtain a certificate of discharge.

The State disputes that it would have been rational for Ms. Contreras to reject the plea bargain, pointing to what it characterizes as the "ironclad" nature of the prosecution's case. Resp't's Br. at 21. But since adverse immigration consequences are themselves a severe penalty and can mean exile and separation from family, the strength of the State's case does not compel a conclusion that Ms. Contreras could not rationally

21

have decided to take her chance at trial. *See Sandoval*, 171 Wn.2d at 175-76. And in one sense, the documentary character of the State's evidence supports the bona fides of Ms. Contreras's claim that she would have been willing to take her chances: she is willing, now, to lose the benefit of her plea bargain, knowing that the State represents that it has a strong documentary case. It will not be handicapped in a future trial by the inability to locate witnesses or by memories that will have faded.

Ms. Contreras has demonstrated that her lawyer's failure to advise her of her foreseeable inadmissibility and ineligibility for cancellation of removal prejudiced her. We reverse the trial court, vacate her conviction, and remand to the trial court for proceedings consistent with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

I CONCUR:

_____
Fearing, J.

22

No. 36109-8-III (consol. w/ No. 36425-9-III)

PENNELL, A.C.J. (dissenting) —To prevail on her personal restraint petition, Maria Contreras must show a reasonable probability that, had she received appropriate immigration advice back in 2003, she would have opted to take her case to trial instead of accepting the State's plea offer. *State v. Sandoval*, 171 Wn.2d 163, 174-75, 249 P.3d 1015 (2011). I do not believe Ms. Contreras as met this burden.

Most significantly, Ms. Contreras has never claimed she would have been willing to take her case to trial. *Cf. Sandoval*, 171 Wn.2d at 175 (Prejudice was shown where the defendant swore "he would have rejected the plea offer had he known the deportation consequence."). Instead, Ms. Contreras states that had she received complete advice, she "would have done anything . . . to find a lawyer who could save [her] from giving up any chances to become a [United States] citizen." Clerk's Papers (CP) at 188. It is unclear to me how this statement is responsive to the inquiry at hand. Ms. Contreras must show that, faced with the binary choice of the State's offer or going to trial, she would have chosen the latter. She has not done so. Ms. Contereras's silence on this fundamental topic is telling and should be fatal to her request for relief.

Even if Ms. Contreras claimed that complete immigration advice would have prompted her to go to trial, the prejudice inquiry would not end. Ms. Contreras would still

need to demonstrate that the choice of proceeding to trial "'would have been rational under the circumstances.'" *Sandoval*, 171 Wn.2d at 175 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 372, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010)). Again, the record is silent in this regard.

This is not a case where Ms. Contreras stood to lose an existing immigration benefit as a result of her plea. Ms. Contreras was undocumented. She was therefore removable regardless of a criminal conviction. 8 U.S.C. § 1229a(e)(2)(B). Ms. Contreras's case stands in contrast to *Sandoval*, where the defendant was a legal permanent resident and could not be placed in deportation proceedings without a conviction.

Ms. Contreras proffers that her conviction lost her the possibility of qualifying for cancellation of removal under 8 U.S.C. § 1129b(b)(1). But Ms. Conteras fails to show that she would have been a candidate for cancellation of removal, regardless of her conviction. Cancellation of removal is not an affirmative basis for seeking immigration status. It is a discretionary defense to removal. *See Pereira v. Sessions*, __ U.S. __, 138 S. Ct. 2105, 2109, 201 L. Ed. 2d 433 (2018). To be eligible to request cancellation of removal, an undocumented immigrant must show four elements: (1) 10 years of physical presence in the United States, (2) good moral character during the 10-year period, (3) no disqualifying crime, and (4) "exceptional and extremely unusual hardship" to the applicant's United States citizen or lawful permanent resident "spouse, parent, or child."

24

*See* 8 U.S.C. 1229b(b)(1).[7] While the absence of a conviction for welfare fraud may[8] have allowed Ms. Contreras to establish element (3), the record is silent as to every other element.

This is not a case where Ms. Contreras had nothing to lose by going to trial, thereby making the choice to go to trial rational regardless of the implausibility of obtaining cancellation of removal. Ms. Contreras's plea agreement recommended no jail

---

[7] The hardship showing "must be greater than the typical hardship endured by close family members when the alien is removed." *Marin-Garcia v. Holder*, 647 F.3d 666, 672 (7th Cir. 2011).

[8] Recent case law developments suggest Ms. Contreras's welfare fraud conviction may not, in fact, constitute a crime of moral turpitude. Under United States immigration law, certain petty offenses are excluded from the crime of moral turpitude definition. A petty offense is one where "the maximum penalty possible for the crime of which the alien was convicted . . . did not exceed imprisonment for one year and, if the alien was convicted of such crime, the alien was not sentenced to a term of imprisonment in excess of 6 months." 8 U.S.C. § 1182(a)(2)(A)(ii)(II). Ms. Contreras was sentenced prior to the United States Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). Prior to *Blakely*, the maximum penalty for Ms. Contreras's offense (welfare fraud in violation of former RCW 9A.56.030(1)(a) (1995) and former RCW 74.08.331 (1998)) would have been believed to be the statutory maximum of 10 years, without regard to the applicable sentencing guidelines. But *Blakely* changed the understanding of maximum penalties. As a result of *Blakely* and subsequent Supreme Court cases, the Ninth Circuit Court of Appeals holds that when a federal statute asks whether a Washington offense was "punishable by imprisonment for a term exceeding one year," the inquiry relates to the high end of the defendant's standard guideline range, not the statutory maximum. *United States v. Valencia-Mendoza*, 912 F.3d 1215 (9th Cir. 2019). The high end of Ms. Contreras's standard guideline range was 60 days, well short of the petty offense cap of one year. Although the petty offense exception uses the language "maximum penalty possible" instead of "punishable by," 8 U.S.C. § 1182(a)(2)(A)(ii)(II), the two terms are sufficiently similar to raise a question about whether Ms. Contreras's offense may qualify as a petty offense and, therefore, not qualify as a crime of moral turpitude.

time. This arrangement likely was valuable to Ms. Contreras as a single mother of several children.[9] In addition, because Ms. Contreras was undocumented, staying out of jail meant she faced a reduced risk of coming to the attention of immigration authorities and being placed in removal proceedings.[10] The materials submitted with Ms. Contreras's personal restraint petition fail to address whether she was willing to spend time in jail, away from her children, and incur an increased risk of deportation proceedings, simply in order to retain a theoretical chance at cancellation of removal.

Contrary to the majority, I do not find Ms. Contreras's current willingness to upend her criminal conviction and take her chances at trial to be compelling evidence she would have made the same choice back in 2003. Two points are important in this regard. First, Ms. Conteras's current decision to file a personal restraint petition suggests she may have recently come to the attention of the immigration authorities. To the extent this is true, Ms. Contreras's motivation to avoid attention would not be the same today as

---

[9] Ms. Contreras's declaration states she has four children she has "been raising without any help." CP at 188.

[10] *See* Wash. Defender Ass'n, *Defending Noncitizens Charged with Washington Theft Offenses* (Oct. 2017), https://defensenet.org/wp-content/uploads/2017/11/WDAIP-Theft-Advisory-update-10-25-2017-FINAL.pdf ("Staying out of jail should lower, but not eliminate risk of [Immigration and Customs Enforcement] apprehension."). Although this practice advisory is from 2017, the government's practice of identifying undocumented persons in local jail facilities for purposes of initiating removal proceedings is not a new one. *See, e.g.*, *United States v. Salgado*, 292 F.3d 1169, 1171 (9th Cir. 2002); *United States v. Camarillo-Tello*, 236 F.3d 1024, 1025 (9th Cir. 2001); *United States v. Godinez-Rabadan*, 289 F.3d 630, 632 (9th Cir. 2002).

it was back in 2003. Second, although the State's case against Ms. Contreras "was ironclad" at the time of her 2003 plea, Resp't's Br. at 21, it may not remain so today. At the time of Ms. Contreras's conviction, the State claims it had sworn written statements and a confession to support its case. But the record is silent as to whether the paperwork and witnesses necessary to revive the case remain available today. Given the not-insignificant chance the State has not retained records pertaining to a long-final conviction, and that witnesses to Ms. Contreras's purported confession may no longer be available, Ms. Contreras would undoubtedly have a better chance of winning at trial today than she did back in 2003.

This case falls far short of the requirements for showing prejudice under *Padilla* and *Sandoval*. I therefore dissent.

_____

Pennell, A.C.J.